## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| RAFFI ELMAJIAN, Derivatively on Behalf of Nominal Defendant FLUENCE ENERGY, INC., | ) ) ) | |
| | ) | Case No. 1:25-cv-521 |
| Plaintiff, | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| JULIAN NEBREDA, AHMED PASHA, MANAVENDRA SIAL, HERMAN BULLS, CYNTHIA ARNOLD, EMMA FALCK, RICHARD FALÚ, ELIZABETH FESSENDEN, HARALD VON HEYNITZ, BARBARA HUMPTON, TISH MENDOZA, AXEL MEIER, JOHN CHRISTOPHER SHELTON, and SIMON JAMES SMITH, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| FLUENCE ENERGY, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Raffi Elmajian ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Fluence Energy, Inc. ("Fluence" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which

included, among other things, a review of the Company's publicly available documents, conference call transcripts and announcements made by the Company, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Ready Capital, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Abramov v. Fluence Energy, Inc. et al.*, Case No 1:25-cv-00444-PTG-IDD (E.D. Va.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Fluence against certain of its current and former officers and members of the Company's Board (collectively, the "Individual Defendants")[1] for breaches of their fiduciary duties between at least November 29, 2023 and February 10, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Fluence is a purported global market leader that delivers energy storage and optimization software for renewables and storage. The Company offers energy storage products and solutions, delivery services, recurring operational maintenance ("O&M") services, and digital applications and solutions for energy storage and other power assets.

3.      According to the Company's public filings, as of September 30, 2034, the Company has deployed energy storage products and solutions in thirty-three markets in twenty-five different

---

[1] The Individual Defendants are Julian Nebreda ("Nebreda"), Ahmed Pasha ("Pasha"), Manavendra Sial ("Sial"), Herman Bulls ("Bulls"), Cynthia Arnold ("Arnold"), Emma Falck ("Falck"), Richard Falú ("Falú"), Elizabeth Fessenden ("Fessenden"), Harald von Heynitz ("von Heynitz"), Barbara Humpton ("Humpton"), Tish Mendoza ("Mendoza"), Axel Meier ("Meier"), John Christopher Shelton ("Shelton"), and Simon James Smith ("Smith"). "Defendants" means Fluence and the Individual Defendants.

countries. The Company sells its energy storage solutions, services, and digital applications to a wide range of customers around the world, including utilities and load-serving entities, independent power producers ("IPPs"), developers, conglomerates, and commercial and industrial ("C&I") customers.

4. The Company conducts its business operations through Fluence Energy, LLC and its subsidiaries. Fluence Energy, LLC was formed in 2017 as a joint venture between Siemens Industry, Inc., an indirect subsidiary of Siemens AG ("Siemens"), and AES Grid Stability, LLC, an indirect subsidiary of The AES Corporation ("AES").

5. According to the Company's annual report for the fiscal year 2024 filed on a Form 10-K with the SEC (the "2024 10-K"), as of September 30, 2024, approximately 41% of the Company's revenue came from related parties, primarily AES and its affiliates. Moreover, as of September 30, 2024, AES and Siemens, through their affiliates and subsidiaries, collectively owned 79.9% of the combined voting power of Fluence's common stock.

6. Throughout the Relevant Period, the Individual Defendants made or caused the Company to materially false and misleading representations concerning the Company's business operations and financial prospects. For instance, on November 29, 2023, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2023 (the "4Q23 Earnings Call"). During the 4Q23 Earnings Call, Defendant Nebreda touted the Company's success, stating, in relevant part, "we had a robust financial performance contributing to a record-breaking annual revenue" and that "we proactively secured our future by solidifying our battery supply for fiscal years 2024 and 2025, thus ensuring our ability to meet our growing demand."

7. However, the truth began to emerge on February 22, 2024, when Blue Orca Capital,

a short seller, issued a report revealing that Siemens and AES had been divesting their interest in Fluence, and that Siemens Energy, the U.S. affiliate of Siemens, filed a counterclaim against Fluence in November 2023 accusing Fluence of misrepresentations, breach of contract, and fraud. The report also revealed that a large portion of Fluence's sales and earnings growth were attributable to "aggressive revenue pull-forwards" and "selectively applied earnings adjustments," meaning that the Company's reported revenues were unreliable and artificially inflated.

8.       On this news, Fluence's stock price fell $2.28 per share, or approximately 13%, from a closing price of $17.01 per share on February 21, 2024, to a closing price of $14.73 per share on February 22, 2024.

9.       On the same day, the Company issued a press release responding to the Blue Orca Capital report and denied the allegations. The Company alleged that the report "wrongly implies AES is moving away from Fluence as a supplier" and that "Fluence continues to be AES' preferred Battery Energy Storage Systems technology provider" and that the Company's "robust pipeline of sales to other customers continues to grow." Fluence also claimed that "[w]e believe the litigation with Siemens Energy has no effect on our strong relationship with Siemens AG." Moreover, the Company touted that "the diversification of our customer base reflects the financial strength of our business and is part of our long-term strategy."

10.      The truth fully emerged on February 10, 2025, when Fluence issued a press release announcing its financial results for the first quarter of 2025 (the "1Q25 Earnings Release"). In the 1Q25 Earnings Release, the Company reported a net loss of $57 million, or $0.32 per share, for the first quarter, compared to a net loss of $25.6 million, or $0.14 per share, for the same quarter of 2024. Fluence also reported that revenue of $186.8 million for the quarter, a decrease of 49% from the same quarter in 2024. The Company revealed that it was lowering its total revenue

guidance for 2025 to $3.1 billion to $3.7 billion, a decrease from the prior guidance of $3.6 billion to $4.4 billion. In explaining the decrease, Defendant Nebreda stated that "[w]e have experienced customer-driven delays in signing certain contracts that, coupled with competitive pressures, result in the need to lower our fiscal year 2025 outlook."

11.    On this news, Fluence's stock price fell $6.07 per share, or approximately 46%, from a closing price of $13.07 per share on February 10, 2025, to a closing price of $7.00 per share on February 11, 2025.

12.    As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors that: (i) Fluence's relationship with Siemens and AES was likely to decline and the entities were likely to divest their interests in Fluence; (ii) Siemens Energy had accused Fluence of engineering failures and fraud; (iii) Fluence's margins and revenue growth were artificially inflated due to Siemens' and AES' moves to divest their interest in Fluence; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

13.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and failed to exercise adequate risk oversight.

14.    As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Nebreda and Pasha on March 11, 2025, in the United States District

Court for the Eastern District of Virginia, exposing the Company to massive class-wide liability and costs related to defending itself in the Securities Class Action.

15.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

16.    Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Fluence's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R.§ 240.14a-9).

18.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Fluence maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## **PARTIES**

*Plaintiff*

23.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Fluence.

*Nominal Defendant*

24.     Nominal Defendant Fluence is a Delaware corporation with its principal executive offices located at 4601 Fairfax Drive, Suite 600, Arlington, Virginia 22203.  Fluence's common stock trades on the NASDAQ Global Select Market under the ticker symbol "FLNC."

*Individual Defendants*

25.     Defendant Nebreda has served as President and Chief Executive Officer ("CEO") of the Company since September 2022 and as a director of the Company since September 2021.

Nebreda also serves as a member of the Company's Finance and Investment Committee. According to the Company's public filings, Defendant Nebreda received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $1,774,772 |
| 2024 | $6,607,788 |

26.     Defendant Pasha has served as Senior Vice President and Chief Financial Officer ("CFO") of the Company since January 2024. According to the Company's public filings, Defendant Pasha received $3,283,390 in compensation from the Company in 2024.

27.     Defendant Sial served as Senior Vice President and CFO of the Company from September 2022 until December 2023. According to the Company's public filings, Defendant Sial received $1,423,654 in compensation from the Company in 2023.

28.     Defendant Bulls has served as Chairperson of the Board since October 2021. Bulls also serves as Chairperson of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee and Finance and Investment Committee. According to the Company's public filings, Defendant Bulls received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $275,009 |
| 2024 | $275,002 |

29.     Defendant Arnold has served as a director of the Company since October 2021. Arnold also serves as Chairperson of the Company's Compensation and Human Resources Committee and as a member of the Company's Nominating and Corporate Governance Committee and Audit Committee. According to the Company's public filings, Defendant Arnold received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $240,009 |
| 2024 | $240,002 |

30. Defendant Falck served as a director of the Company from September 2021 until March 2025.

31. Defendant Falú has served as a director of the Company since September 2022. Falú also serves as a member of the Company's Finance and Investment Committee.

32. Defendant Fessenden has served as a director of the Company since October 2021. Fessenden also serves as a member of the Company's Audit Committee and Compensation and Human Resources Committee. According to the Company's public filings, Defendant Fessenden received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $235,526 |
| 2024 | $230,002 |

33. Defendant von Heynitz has served as a director of the Company since October 2021. von Heynitz also serves as Chairperson of the Company's Audit Committee and as a member of the Company's Compensation and Human Resources Committee and Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant von Heynitz received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $239,441 |
| 2024 | $245,002 |

34. Defendant Humpton has served as a director of the Company since September 2021. Humpton also serves as a member of the Company's Compensation and Human Resources Committee.

35. Defendant Mendoza has served as a director of the Company since August 2022.

9

Mendoza also serves as a member of the Company's Nominating and Corporate Governance Committee and Compensation and Human Resources Committee.

36.    Defendant Meier has served as a director of the Company since January 2020. Meier also serves as a member of the Company's Nominating and Corporate Governance Committee and Finance and Investment Committee.

37.    Defendant Shelton has served as a director of the Company since January 2018.

38.    Defendant Smith has served as a director of the Company since June 2021. Smith also serves as Chairperson of the Company's Finance and Investment Committee.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of their positions as officers and/or directors of Fluence, and because of their ability to control the business and corporate affairs of Fluence, the Individual Defendants owed Fluence and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fluence in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Fluence and its shareholders.

40.    Each director and officer of the Company owes to Fluence and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

41.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fluence, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.    To discharge their duties, the officers and directors of Fluence were required to exercise reasonable and prudent supervision over the management, policies, controls, and

10

operations of the Company.

43.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fluence, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45.    To discharge their duties, the officers and directors of Fluence were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

11

controls of the Company.  By virtue of such duties, the officers and directors of Fluence were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Virginia and the United States, and pursuant to Fluence's own Code of Conduct & Ethics (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Fluence conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Fluence and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fluence's operations would comply with all applicable laws and Fluence's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.    Each of the Individual Defendants further owed to Fluence and the shareholders the duty of loyalty requiring that each favor Fluence's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

47.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Fluence and were at all times acting within the course and scope of such agency.

48.    Because of their advisory, executive, managerial, and directorial positions with Fluence, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fluence.

**FLUENCE'S CODE OF CONDUCT**

50.    The Company's Code of Conduct applies to all Fluence team members, including the Company's directors, officers, and employees, both at Fluence and its subsidiaries.

51.    The Code of Conduct begins with a letter from Defendant Nebreda, which states, in part, "[a]t Fluence, our company Values are the foundation of everything we do. They define the work environment we want to have, the reputation we want to enjoy, and the way we make

13

decisions. They are the basis of our company culture." The letter further states "To live up to our Values, we must have a company grounded in ethical and compliant practices. Our investors, customers, suppliers, communities and fellow colleagues rightfully expect it from us, and we are right to expect the same principles from everyone with whom we do business."

52.    Under a section titled "Our General Principles," the Code of Conduct states, in relevant part:

**COMPLIANCE WITH THE LAW**

We will follow all laws, regulations and policies that govern our work. In some cases, our Values strive for a higher standard than what laws and regulations require. Laws and regulations may differ depending on the country or state in which we work, our country of citizenship or the Fluence business entity for which we work.

Because Fluence is a company based in the United States, some United States laws apply to Fluence business outside of the United States, for example United States anti-corruption laws and United States embargoes and sanctions against certain countries. Fluence team members must understand what laws apply to our business activities and should consult with Fluence legal counsel when in doubt. . . .

**CORPORATE DISCLOSURE**

The information in our public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable. To ensure Fluence meets this standard, the employees, directors and officers of Fluence who are involved with financial reporting, SEC filings, investor relations and public communications are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to Fluence, commensurate with their duties. These persons are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about us to others, including our independent auditors, governmental regulators and self-regulatory organizations.

In addition, it is our policy to disclose material information concerning Fluence to the public only through specific limited channels to avoid inappropriate publicity and to ensure that all those with an interest in the Company will have equal access to information. Please refer to Fluence's "Corporate Disclosure Policy."

14

**INSIDER TRADING**

Trading on inside information is a violation of federal securities law. Fluence people in possession of material non-public information about Fluence or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal.

53.    Under a section titled "Conflicts of Interests," the Code of Conduct states, in

pertinent part:

**I. GENERAL GUIDELINES**

A conflict of interest occurs when the private interests of a Fluence director, officer, employee or independent contractor interfere in any way, or even appear to interfere with the interests of Fluence as a company. A conflict of interest can arise if such person takes actions or has interests that may make it difficult for him/her to perform his/her company work objectively and effectively. Conflicts of interest also arise when such a person or a member of his or her family receives improper benefits as a result of such person's position in the Company. A conflict can take the form of a business relationship with, or an interest in, a competitor or customer of Fluence, or participation in sideline activities that prevent employees from being able to fulfill their responsibilities at Fluence.

Corporate Opportunity
All employees, directors and officers of Fluence owe a duty to Fluence to advance the legitimate interests of Fluence when the opportunity to do so arises. Such persons are prohibited from directly or indirectly (a) taking personally for themselves opportunities that are discovered through the use of Fluence property, information or positions; (b) using Fluence property, information or positions for personal gain; or (c) competing with Fluence for business opportunities, unless otherwise approved by the disinterested members of the Board of Directors.

It is important that all employees recognize and avoid conflicts of interest, or even the appearance of a conflict of interest, as they conduct their professional activities. We will avoid such situations. Our business decisions will be governed by judgment, objectivity, and loyalty toward Fluence and our stakeholders, not by our personal interests.

15

**II. OUTSIDE EMPLOYMENT AND OTHER OUTSIDE ACTIVITIES**

In some circumstances, outside employment or outside activities can interfere with our job responsibilities or conflict with Fluence's business interests. In order to avoid such circumstances, we will not use Fluence's name, information, work time, property, or other resources to perform a second job or to undertake other outside activities. Every employee of Fluence is encouraged to consider potential conflicts with Fluence business interests before agreeing to serve as a director or officer for an outside business, seeking a political or other government position, or engaging in service with a charitable, civic, religious, educational, public, political, or social organization. However, nothing in this clause shall prevent the respective Fluence employee from asserting any of his rights as a citizen of his or her state of residence.

## FLUENCE'S AUDIT COMMITTEE CHARTER

54.     Fluence's Audit Committee Charter states that the purpose of the Audit Committee is to, among other things, "oversee and monitor the quality, reliability and integrity of the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and to oversee the Company's compliance with legal, contractual and

55.     The Audit Committee Charter states that Fluence's Audit Committee has the following duties and responsibilities, among others:

*Interaction with the Independent Auditor*

1.     *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm will report directly to the Committee. The Committee is responsible for approving the scope, including staffing, of all audit and non-audit services provided to the Company by the independent auditor. The Committee is responsible for reviewing, in consultation with management and the internal auditors, the performance of each such accounting firm at least annually and removing the accounting firm if circumstances warrant. . . .

16

*Annual Financial Statements and Annual Audit*

5.      *Audit Planning*. The Committee will meet with the independent auditor prior to the audit to review the planning and staffing of the audit, and to discuss with the independent auditor the scope of its examinations of the book and records of the Company and its subsidiaries and the matters required to be discussed by the Statement of Auditing Standards No. 61, as amended, relating to the conduct of the audit.

6.      *Audit Issues*. The Committee will discuss with the independent auditor any audit issues or difficulties and assess the adequacy of management's response.

7.      *Form 10-K Review*. The Committee will review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and shall make a recommendation to the Board as to whether the annual audited statement should be included in the 10-K.

8.      *Audit Committee Report*. The Committee will provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

9.      *Form 10-Q Review*. The Committee will review, discuss and approve the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

10.     *Review of Earnings Releases*. The Committee will review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies (if any)

11.     *Internal Audit Function*. The Committee will oversee the design, implementation, organization and performance of the Company's internal audit function (if any). The Committee will review reports to management prepared by the internal auditors and any responses to same by management. The Committee will be responsible for reviewing and approving the internal audit charter, scope, responsibilities, plans, budget, staffing, organizational structure and results on at least an annual basis. The head of the internal auditors will also report to and be evaluated by the Committee.

12.    *Internal Control Over Financial Reporting; Disclosure Controls and Procedures*. The Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting and disclosure controls and procedures, including the area of taxation, including with respect to scope, design, adequacy and effectiveness. The Committee shall review, with management, the internal auditor and the independent auditor the integrity of the Company's financial reporting processes, both internal and external, and discuss:

i. major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

ii. analyses or other written communication prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analysis of the effect of alternative GAAP methods on the financial statements, and the ramifications of the use of such alternative methods;

iii. other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted differences;

iv. the critical accounting policies and practices of the Company;

v. the effect of regulatory and accounting initiatives, as well as off-balance sheet transactions, arrangements, obligations and structure, on the financial statements of the Company; and

vi. the type and presentation of information included in earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as review of any financial information and earnings guidance provided to analysts and rating agencies (paying particular attention to the use of non-GAAP financial information).

The Committee shall engage the independent auditor to provide attestation services related to internal control over financial reporting. The Committee shall review the independent auditor's report on internal control. The Committee shall review with management the scope, and results of testing, including the mitigation of material weaknesses and significant deficiencies identified by the independent auditor.

13.    *Risk Assessment and Risk Management*. The Committee will review and discuss the effectiveness of the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled, and oversee management of the Company's financial risks and such other material risks, including but not limited to computerized information systems, facing the Company, including

18

management's responses to findings and recommendations.

14. *Complaint Procedures*. The Committee will review policies and procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters. Any changes to the policy will be recommended to the Board as appropriate. The Committee will review with management and the independent auditor any outside party, including regulators, government agencies and stockholders complaints or published reports which raise material issues regarding the Company's financial statements or accounting policies and management's response to such complaints or findings.

15. *Review of Related Person Transactions*. The Committee will be responsible for reviewing and approving related person transactions (as defined by applicable law or stock exchange rules) in accordance with the Company's Related Person Transaction Policy and Procedures. The Policy will be reviewed by the Committee on an annual basis.

16. *Legal*. The Committee will be responsible for reviewing, periodically, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements and any legal compliance matter, including compliance with insider trading policies.

17. *Compliance and Ethics*. The Committee will be responsible for reviewing and assessing policies, procedures and practices established to monitor compliance with applicable laws, regulations, policies and standards of ethical conduct, including the Company's Code of Conduct. The Committee will recommend to the Board any changes to the Code as may be appropriate. The Compliance Officer(s) shall have the authority to communicate directly with the Chair of the Committee at any time, including with respect to the implementation and effectiveness of the Company's compliance and ethics programs or any matter regarding actual or potential criminal conduct.

18. *Environmental, Social and Governance ("ESG")*. The Committee will be responsible for oversight of audit and assurance processes relating to ESG reporting within applicable financial reporting frameworks, including all disclosures filed with the Securities and Exchange Commission.

19. *Reports to the Board of Directors*. The Committee will report regularly to the Board regarding the activities of the Committee. . . .

## SUBSTANTIVE ALLEGATIONS

### *Background*

56.    Formed in 2021, Fluence is a purported global market leader that delivers energy storage and optimization software for renewables and storage. The Company offers energy storage products and solutions, delivery services, recurring O&M services, and digital applications and solutions for energy storage and other power assets.

57.    According to the 2024 10-K, as of September 30, 2034, the Company has deployed energy storage products and solutions in thirty-three markets in twenty-five different countries. The Company sells its energy storage solutions, services, and digital applications to a wide range of customers around the world, including utilities and load-serving entities, IPPs, developers, conglomerates, and C&I customers.

58.    Fluence conducts its business operations through Fluence Energy, LLC and its subsidiaries. Fluence Energy, LLC was formed in 2017 as a joint venture between Siemens Industry, Inc, a subsidiary of Siemens, and AES Grid Stability, LLC, a subsidiary of AES.

59.    Siemens and AES, along with Qatar Holding LLC ("QHL"), an affiliate of Qatar Investment Authority ("QIA") were, and continue to be, significant equity holders in Fluence. According to the 2024 10-K, as of September 30, 2024, approximately 41% of the Company's revenue came from related parties, primarily AES and its affiliates. Moreover, as of September 30, 2024, AES Grid Stability LLC held approximately 66.6% of the combined voting power of Fluence common stock, Siemens and its affiliate owned held 13.3% of the combined voting power of Fluence common stock and approximately 28.5% of the economic interest in Fluence, and QHL held approximately 3.8% of the combined voting power of Fluence and 8.1% of the economic interest in Fluence.

60.    Accordingly, AES and Siemens, through their subsidiaries and affiliates, collectively own 79.9% of the combined voting power of Fluence common stock and 28.5% of the economic interest in Fluence.

61.    Throughout the Relevant Period, the Individual Defendants made or caused the Company to make statements materially false and misleading representations concerning the Company's business operations and financial prospects and performance.

62.    For instance, on November 28, 2023, the day before the Relevant Period, the Company issued a press release announcing its financial results for the fourth quarter of fiscal year 2023 (the "4Q23 Earnings Release"). In the 4Q23 Earnings Release, Defendant Nebreda touted the Company's performance, stating "I'm pleased to report that we reached a transformative milestone in the fourth quarter, achieving profitability for the first time." The Company reported "record revenue" of $2.2 billion for the full year of 2023, an increase of 85% from 2022, and revenue of $673 million for the fourth quarter of 2023, an increase of 25% from the same quarter in 2022.

63.    However, in reality, the Company's sales and earnings growth was artificially inflated and driven by "aggressive revenue pull-forwards" and "selectively applied earnings adjustments."

***Individual Defendants' Materially False and Misleading Statements***

64.    On November 29, 2023, the Company hosted the 4Q23 Earnings Call. During the 4Q23 Earnings Call, Defendant Nebreda touted the Company's success, stating:

> I want to emphasize the key takeaways from this quarter's results. Firstly, we had a robust financial performance contributing to a record-breaking annual revenue. Attaining profitability for the first time is a significant milestone, and we aim to capitalize on this achievement in fiscal 2024. Second, we proactively secured our future by solidifying our battery supply for fiscal years 2024 and 2025, thus ensuring our ability to meet our growing demand.

Finally, the introduction of our new $400 million ABL facility provides us an additional tool to continue capturing the robust growth of the utility scale.

65.    Defendant Nebreda went on in the 4Q23 Earnings Call to discuss the Company's key highlights, stating, in part:

I'm pleased to report that in the quarter, we recognized $673 million of revenue. We continued to experience strong demand for our products and services, with new orders totaling approximately $737 million, highlighted by our solutions business contracting 2.1 gigawatt hours, our services business adding 1.6 gigawatt hours, and our digital business adding 1.8 gigawatts of new contract. . . .

As you may recall, a year ago we embarked on the transformation of our business. I'm pleased to report that we delivered on our commitments to the market. We grew our annual revenue by 85% and achieved our first profitable quarter. Importantly, we exceeded our original annual revenue guidance by more than $600 million, thanks to improved execution, ease in supply chains, and project timeline acceleration.

66.    Defendant Nebreda also assured investors that the Company was on track for 2024 and 2025, stating "I'm pleased to report that we have secured all our battery needs for fiscal 2024 and 2025."

67.    On the same day, filed its annual report for the fiscal year 2023 on a Form 10-K with the SEC (the "2023 10-K"). Under the "General Risk Factors" section, the 2023 10-K, stated that "[a]s of September 30, 2023, the material weakness in internal control over revenue recognition has not fully been remediated. The Company's controls related to its estimate at completion ("EAC"), which is used in the Company's percentage of completion ("POC") accounting for its battery energy storage solutions were not effective."

68.    The 2023 10-K was signed, either directly or by proxy, by Defendants Nebreda, Sial, Bulls, Mendoza, Humpton, Falck, Meier, Shelton, Smith, Fessenden, Arnold, Falú, and von Heynitz. The 2023 10-K was also accompanied by certifications made by Defendants Nebreda and Sial pursuant to Sections 13a-14(a) and 15d-14(a) of the Exchange Act and Section 302 of the

22

Sarbanes-Oxley Act of 2002 (the "SOX Certifications"). In the SOX Certifications, Defendants Nebreda and Sial attested to the accuracy of the 2023 10-K.

69.    On January 26, 2024, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2023 Proxy"). The 2023 Proxy assured investors that the Company had effective risk oversight mechanisms in place, stating:

> ***Risk assessment and oversight are an integral part of our governance and management processes***. Our Board is responsible for overseeing our risk management process, while management is responsible for addressing the day-to-day risks facing our Company. Our Board focuses on our general risk management policies and strategy and the most significant risks facing the Company, and oversees the implementation of risk mitigation strategies by management. Management apprises our Board of risk management matters when they arise in connection with other topics within the Board's oversight. A fundamental part of risk oversight is not only understanding the material risks a company faces and the steps management is taking to manage those risks, but also understanding what level of risk is appropriate for the Company. While the full Board has overall responsibility for risk oversight, it is supported in this function by its Audit Committee, Compensation and Human Resources Committee, Nominating and Corporate Governance Committee, and Finance and Investment Committee.

> ***The Audit Committee is specifically tasked with overseeing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which our exposure to risk is handled***. In doing so, the Audit Committee oversees the Company's enterprise risk management program, which identifies and monitors those primary risks to the Company's business and management and select employees, including members of internal audit, will provide the Audit Committee with interim updates of such identified risks. The Company's Internal Audit team assists management in identifying, evaluating and implementing risk management controls and methodologies to address identified risks. At each of its quarterly meetings, the Audit Committee meets privately with representatives from the Company's independent registered public accounting firm, the head of Internal Audit and may meet with the Company's General Counsel. The Company's Chief Compliance Officer also regularly updates the Audit Committee privately on the Company's compliance and ethics programs and any other compliance matter or concern. ***The Audit Committee provides reports to the Board which describe the current state of risk assessment and risk management of the Company. In addition to the above, our Audit Committee directly oversees the management of financial risks*** and cybersecurity risks pursuant to the terms of the Audit Committee Charter.

> ***In addition, our Board and each of its committees, has an active role in overseeing management of the Company's risks***. Our Board regularly reviews information regarding our strategy and operations, as well as the risks associated with each. Our Compensation and Human Resources Committee is responsible for overseeing the management of risks relating to the Company's compensation plans and arrangements, leadership succession planning, and the attraction and retention of key talent. See "*Compensation Discussion and Analysis - Determination of Executive Compensation - Compensation Risk Assessment*." Our Nominating and Corporate Governance Committee manages risks associated with the independence of the Board and potential conflicts of interest. Our Finance and Investment Committee helps to manage risks associated with our credit, liquidity, and financing activities and plans as well as tax strategies and potential strategic transactions and opportunities. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. In addition, our Board receives periodic detailed operating performance reviews from management.

(Emphasis added).

70.     The 2023 Proxy also assured investors that the Company's officers and the Board were subject to its Code of Conduct, stating:

> We have adopted a Code of Conduct and Ethics (the "Code of Conduct") that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. Our Code of Conduct is available under the Governance section of the Investor Relations page of our website located at *www.ir.fluenceenergy.com*.

71.     On February 7, 2024, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2024 (the "1Q24 Earnings Release"). The 1Q24 Earnings Release reported revenue of $364 million for the first quarter of 2024, an increase of 17% from the same quarter in 2023. The 1Q24 Earnings Release also reaffirmed the Company's fiscal year 2024 revenue guidance of $2.7 billion to $3.3 billion. Defendant Nebreda was quoted in the 1Q24 Earnings Release as stating, in relevant part, "[w]e are off to a strong start for 2024 with a record quarterly order intake[.] We continue to see a very robust market for energy storage. . . ."

24

72.     On February 8, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of fiscal year 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Nebreda touted the Company's "successful" quarter and assured investors that the Company was poised for future success, stating, in relevant part:

> I'm pleased to report that we are off to a good start for fiscal 2024 and continue to benefit from our robust energy storage market. In the first quarter, we recognized $364 million of revenue. Furthermore, we delivered our second consecutive quarter of double-digit gross margin. Our adjusted EBITDA for the first quarter was approximately negative $18 million, in line with our expectations and an improving from negative $26 million in the first Q of 2023.
>
> Additionally, we recognized a record $1.1 billion of new orders. This is broken down by our solution business contracted 2.7 gigawatt hours. Our services business adding 2.3 gigawatt hours and our digital business adding 400 megawatt hours of new contracts. Furthermore, our signed contract backlog as of December 31st increased $800 million to $3.7 billion. The highest level in our history. Additionally, our pipeline increased $400 million to $13.4 billion which gives us confidence to achieve our growth goals in 2024 and beyond. . . .
>
> First, on delivering profitable growth. This quarter, we continued to grow our backlog as we added $1.1 billion of projects that we expect to yield double digit gross margins.
>
> Our discipline approach to offer competitive solutions to customers keeps us on track to deliver on our financial objectives. Second, we will continue to develop products and solutions that our customers need. As such, I'm pleased to report that we're on track for our battery module manufacturing to begin production in the summer of 2024.

73.     The statements contained in ¶¶ 64-72 were materially false and misleading because Fluence failed to disclose, *inter alia*, that: (i) Fluence's relationship with Siemens and AES was likely to decline; (ii) Siemens Energy accused Fluence of engineering failures and fraud; (iii) Fluence's margins and revenue growths were artificially inflated due to Siemens' and AES' moves to divest; (iv) the Company failed to maintain adequate internal controls and risk oversight; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations,

25

and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

74.     Then, on February 22, 2024, Blue Orca Capital issued its report revealing that Siemens and AES had been divesting their interest in Fluence, stating, in relevant part:

> Siemens and AES have together been Fluence's largest customers, together representing almost 90% of revenue as of Q1 FY22 and over 40% as of Q2 FY23. Siemens has since pulled away. We believe that AES, now Fluence's single largest customer by far, is also poised to hammer Fluence on pricing or take its business elsewhere. According to an interview with a former Fluence employee, AES is increasingly frustrated with its contract, under which it must purchase BESS systems exclusively from Fluence and pay the same prices as other smaller customers. Frustrated with this framework, AES is apparently eager to use its considerable leverage to negotiate better pricing. AES will soon have its chance. We uncovered the AES purchase agreement buried deep within the exhibits to Fluence's filings, which shows that the strict exclusivity and pricing terms set forth in AES's purchase agreement are set to **terminate** once AES's voting power over Fluence drops below a looming threshold. AES started selling Fluence shares in December. Once AES sells down its stake a further 31%, it will be free to demand better pricing commensurate with its size and negotiating leverage, or else take its business elsewhere. If it divests its stake further, the non-compete terminates and AES can even develop competing solutions. With AES already in the process of selling its shares, we believe that **it is only a matter of time before AES has neither a contractual requirement nor a financial incentive to purchase battery storage systems from Fluence at its current generous prices, if at all**. With its largest customer on the precipice of hammering Fluence on pricing, we think this will slash Fluence's revenues and gut its already shaky financials.

75.     The report also revealed that Siemens Energy, the U.S. affiliate of Siemens, filed a counterclaim against Fluence in November 2023, accusing Fluence of misrepresentations, breach of contract, and fraud. Specifically, the report highlighted the effects of the lawsuit on the Company, stating, in part:

> State court filings obtained via courier reveal that, undisclosed to investors, Siemens Energy, the US affiliate of Siemens, Fluence's corporate parent and largest shareholder, has filed a lawsuit accusing Fluence of misrepresentations, breach of contract and fraud. Filed as a counterclaim against Fluence in connection with the Antioch, California project, Siemens Energy alleges a laundry list of embarrassing and costly engineering and design failures as well as knowingly false representations and omissions. The suit is ongoing. In our view, this is the

26

beginning of financial disaster for Fluence, which continues to be hopelessly dependent upon its corporate parents Siemens and AES for sales, financing, and basic corporate functions. We think this lawsuit explains why Siemens has ceased to be major customer, dramatically cutting its once sizable purchases from Fluence to just $11 million in FY23. We also suspect that this lawsuit may explain Siemens's decision to start selling down its 33% ownership stake in Fluence in December 2023, which began only a few days after the allegations were filed in court. This lawsuit, notably the accusations of false representations and fraud, appear to be setting in motion a tidal wave of dilution and selling pressure on Fluence's stock as its major corporate parents sell down their respective stakes. We think that without Siemens, Fluence, will crumble under the weight of its chronic unprofitability and historical cash burn. Ultimately, it is simply stunning that the U.S. energy affiliate of Fluence's largest shareholder has sued the Company, and that Fluence has not disclosed this bombshell to investors.

76.    The report explained that Fluence initially sued Siemens for breach of contract in

September 2023, and Siemens filed a counterclaim against Fluence in November 2023, stating:

In 2020, per court documents, Siemens Energy, Inc., a U.S. affiliate of the Siemens conglomerate, won a large contract from a third-party energy company to construct a generator system in Antioch, California. Siemens Energy hired Fluence to design, engineer, and deliver the Battery Energy Storage System ("BESS"). The project appears to have been a disaster.

Initially, Fluence sued Siemens Energy in September 2023 for breach of contract because the related party customer allegedly refused to pay. Siemens Energy fired back in a counterclaim dated November 28, 2023, alleging that it was Fluence who was at fault for botching its work on the project, failing to deliver the system that it initially represented it would, bungling the design and engineering process, and making material false representations and omissions.

In particular, Siemens Energy alleges that Fluence's work was late and deficient, delaying the project and causing millions in damages. Notably, Siemens Energy claims that Fluence made a unilateral decision to change the design of its systems, supposedly because of an **explosion on another Fluence project**. This redesign caused significant problems in redesigning and reengineering critical electrical componentry for the system. A test of the completed system ultimately failed in May 2022, allegedly due to Fluence's neglect of basic problem points in its system design.

**Siemens Energy brought claims for breach of contract, fraudulent inducement, fraudulent omissions, and breaches of warranties, alleging that Fluence knowingly made false representations and omissions regarding its BESS design, agreeing to deliver a system that it knew it could and would not deliver in the interest of obtaining the contract with Siemens.**

77. The Blue Orca Capital report also revealed that much of Fluence's sales and earnings growth were attributable to "aggressive revenue pull-forwards" and "selectively applied earnings adjustments," meaning that the Company's reported revenues were unreliable and artificially inflated. The report stated:

In the past several quarters, Fluence appears to have moved closer to generating positive earnings, sending its stock price soaring. But we believe that much of Fluence's sales and earnings growth can be attributed to aggressive revenue pull-forwards and selectively applied earnings adjustments. We estimate that the Company inflated its LTM sales growth rate from 58% to over 80% in Q1 FY23 simply by rewriting of customer contracts that allowed it to recognize revenue on customers in advance of product installation. We view this as pure gimmickry, an accounting change on paper that juiced reported revenue growth without improving the business in any material way.

In addition, we believe that an assortment convenient and selective earnings adjustments inflated its incremental Adj. EBITDA by 40% in FY23, and its Adj. Gross Margin from 3.9% to 6.6%. We believe that Fluence, through a series of one-off accounting machinations, has exaggerated its gross margins, revenue growth and earnings growth. These aggressive accounting maneuvers appear to have been undertaken before and during the time that its major shareholders, who appear to wield influence over Fluence's financial reporting by supplying treasury services, began to sell down their respective stakes. But we suspect that these one-time financial gimmicks will come undone as they sell out.

78. In response, on the same day, the Company issued a press release denying the allegations in the Blue Orca Capital report. This press release was the first time the Company disclosed the lawsuit between Siemens Energy and Fluence to investors, despite the suit being filed months prior. In the press release, the Company alleged that the report "wrongly implies AES is moving away from Fluence as a supplier" and that "Fluence continues to be AES' preferred Battery Energy Storage Systems technology provider" and its "robust pipeline of sales to other customers continues to grow." Fluence also claimed that "[w]e believe the litigation with Siemens Energy has no effect on our strong relationship with Siemens AG." Moreover, the Company touted that "the diversification of our customer base reflects the financial strength of our business and is

28

part of our long-term strategy."

79.    Despite the Blue Orca Capital report and the allegations contained therein, Fluence continued to assure investors that the Company was experiencing financial success and was well-positioned for the future.

80.    On May 8, 2024, the Company issued a press release announcing its financial results for the second quarter of fiscal year 2024 (the "2Q24 Earnings Release"). In the 2Q24 Earnings Release, the Company reported revenue of $623.1 million for the quarter and reaffirmed its fiscal year 2024 revenue guidance of $2.7 billion to $3.3 billion. Defendant Nebreda was quoted in the 2Q24 Earnings Release as stating, in part:

> I am pleased to report that in the second quarter, Fluence delivered more than $620 million of revenue and increased its total cash position to more than $540 million. We continued to demonstrate consistent profitability with our third consecutive quarter of double-digit gross margins. This strong financial performance reflects our commitment to strong execution and continuous focus on our customers to deliver competitive, reliable, and safe solutions.

81.    On May 9, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of fiscal year 2024 (the "2Q24 Earnings Call"). During the questions and answers portion of the 2Q24 Earnings Call, Defendant Nebreda discussed the Company's revenue recognition practices, stating:

> So first, I think let's talk revenue recognition because I think it's important to get to know. So what are we -- what do we have? We have -- the way we work, the way our revenue recognition formula works, there's some recognition at the beginning when we signed the contract to the engineer and ordered the equipment, then there is a significant -- and this is a bulk of our revenue recognition is when we transfer title of the equipment to the customer and the additional revenue recognition at substantial completion and final completion. . . .
>
> So this year is a lot back ended. Last year was very, very divided equally around each quarter, the year before the -- it was in the center where most of the center of our fiscal year or most of the revenue was. So it moves around, and it moves around because it is driven by our customer projects time, which, in a way, also is driven by what they signed with their own PPA.

29

So going back, this is mostly driven by delivery or transferring title of manufactured cubes to our customers, limited number of projects, 20 to 25, not -- we are not talking here huge amounts. We've been very, very good at doing this. So we had very, very good KPIs in the close to 100% in terms of delivery capability. So we believe -- so unless there is the global disruption that stops the world trade, we should be able to do this.

82.    Defendant Pasha also highlighted the Company's revenue recognition practices, and touted the Company's successful quarter, stating:

[O]ur revenue recognized as we hit certain milestones. For example, the majority of our Q4 project milestones are for production and delivery of cubes, which is within our control. To that end, we have secured the necessary batteries, manufacturing slots, and logistics. These factors provide us confidence in our ability to deliver on our revenue targets.

83.    On August 7, 2024, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2024 (the "3Q24 Earnings Release"). In the 3Q24 Earnings Release, the Company reported revenue of $483.3 million for the quarter and decrease its fiscal year 2024 revenue guidance to $2.7 billion to $2.8 billion. However, Defendant Nebreda assured investors that the Company was performing well and well-positioned for the future, stating:

We delivered a tremendous quarter highlighted by achieving approximately $15.6 million Adjusted EBITDA, our highest order intake, and a record backlog of $4.5 billion[.] I am pleased to report that we are seeing robust demand globally, highlighted by our U.S. domestic content offering which we will begin delivering at the beginning of 2025, ahead of our competition. [] We continue to execute at a high level as we recently completed the world's third largest battery storage facility for a customer, a monumental achievement. As we look to close out our fiscal year, I am confident in our ability to deliver on our fourth quarter customer obligations, which are projected to be the largest in the Company's history.

84.    On August 8, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of the fiscal year 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Nebreda assured investors of the Company's

30

"strong growth prospects" and stated that "our pipeline is a rolling 24-month view, thus giving us confidence in our ability to continue our growth trajectory. Our $20 million pipeline has increased 65% from this time last year, which reflects rapid growth prospect for any storage globally" and that "[t]he strength of our pipeline is a key reason for our high confidence in our expected revenue growth. We are reaffirming our fiscal year '25 revenue outlook of 35% to 40% growth of our original fiscal '24 revenue guidance at midpoint of $3 billion."

85.     Defendant Pasha further touted the Company's strength, stating "looking ahead to fiscal '25, we continue to expect strong growth, as Julian discussed, using our original fiscal '24 revenue guidance midpoint of $3 billion as a base we reaffirm our expected fiscal '25 revenue growth of 35% to 40%." Defendant Pasha also denied the allegations in the Blue Orca Capital report during the 3Q24 Earnings Call, stating:

> As you may know, a short seller report was published on us back in February of this year. In response to the allegations made in the short report, our Board's Audit Committee conducted an investigation with the assistance of an outside counsel and forensic accountants.
>
> I am pleased to share that this investigation concluded that the allegations contained in the short report are without merit. Recently, however, the SEC notified us that they are investigating certain matters pertaining to the company. Based on the information the SEC has requested, we believe we are examining some of the topics raised in the short seller's report, such as revenue recognition policies and our previously disclosed material weakness. We are fully cooperating with the SEC.
>
> Although we cannot predict the timing or the outcome based on the nature of these matters and information requested by the SEC we do not expect it to have a material impact on our financial condition.

86.     On November 25, 2024, Fluence issued a press release announcing its financial results for the full year and fourth quarter of fiscal year 2024 (the "4Q24 Earnings Release"). In the 4Q24 Earnings Release, the Company reported "record revenue" for 2024 of $2.7 billion, an increase of 22% from 2023, and revenue of $1.2 billion for the fourth quarter, an increase of 82%

from the same quarter in 2023. The Company also reported fiscal year 2025 revenue guidance of $3.6 billion to $4.4 billion. Defendant Pasha was quoted in the 4Q24 Earnings Release as stating, "[w]e are pleased with our strong fiscal year-end performance, achieving record revenue growth, robust margin expansion and free cash flow. We also generated positive net income for the first time[.] With backlog and development pipeline at record levels, we enter fiscal 2025 poised for sustained profitable growth."

87.    On November 26, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of the fiscal year 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Pasha stated:

> [W]e are initiating revenue guidance for fiscal 2025 with a midpoint of $4 billion. This is in line with our prior expectations and represents 50% growth from fiscal 2024. We feel confident about our ability to achieve this target, which is primarily driven by three factors. First, approximately two-thirds of our 2025 revenue is currently in our backlog, consistent with where we were at this point last year. Second, we are in advanced and exclusive negotiations on a number of projects totaling $1.5 billion in value. And third, we have an increasing number of opportunities illustrated by our growing pipeline of projects across the world, as Julian mentioned. For fiscal 2025, we expect an adjusted gross profit margin of between 10% and 15%.
>
> As a result, we expect to deliver an adjusted EBITDA midpoint of $180 million. And for ARR, we continue to see traction in our platform and expect to end the fiscal year with $145 million of ARR. Additionally, from a timing perspective and consistent with last year, we expect fiscal 2025 revenue to be back-end loaded with approximately 20% of annual revenue in the first half and the remaining 80% in the second half of the fiscal year.

88.    During the questions and answers session of the 4Q24 Earnings Call, in response to a question about the Company's 2025 revenue guidance and "backlog coverage," Defendant Nebreda stated:

> So as we said, we have roughly two-thirds of our revenue midpoint guidance in our backlog already. And we are roughly around $1.5 billion in contracts that we're in late stages of negotiations, so we are selected by the customer for the contract. That roughly $1.5 billion, more than half will be revenue that will be covered in 2025.

32

So we feel very confident of our midpoint guidance range. We have some wood to chop. There's some more contracts that we need to sign, but we feel very good with where we are today. In terms of our backlog, as you know, we take a very, very strict view of our backlog situation. And we really look at, in order to have things considered into our backlog, they need to be things that are signed and that we believe we can, you know, that there is a real commitment from our customers to take those projects on time and deliver.

So they're binding deals. So we feel very confident that we have seen very little to none, you know, as delay. As you know, we have talked last year, but we have not seen real cancellations of projects on the backlog once we signed it. Essentially, because we take a very, very strict view. As I always said, there are contracts we have signed that are still subject to certain conditions that are in pipeline. They're not in backlog because they're not at a stage where they can be considered at that point. So we feel very confident about the 66% coverage in our backlog. The contracts were in late stage of negotiation or will be selected that will represent around $1.5 billion of backlog or around $800 million of revenue for the year, for 2025. And then, you know, a small portion we need to cover, we believe we will be able to cover from now to March of next year.

89.    On November 29, 2024, Fluence filed the 2024 10-K. In the 2024 10-K, Fluence reported that:

As of September 30, 2024, we determined that a material weakness in the internal control over revenue recognition exists. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The Company did not consistently apply controls in its revenue recognition process related to the evaluation of contract terms for purposes of determining their impact on when costs are included in the measure of progress.

90.    The 2024 10-K also assured investors that the Company remained competitive in the battery energy storage market, stating, in relevant part:

The competitive landscape for battery energy storage varies across different geographies, countries, grid services, and customer segments. As the global demand for energy storage products and solutions continues to rise, so does the influx of new and potential entrants into the energy storage sector. However, we believe we distinguish ourselves from competitors by our adeptness in identifying and addressing customer needs with tailor-made products, services, and use cases. We believe we maintain a competitive edge through our performance and value creation, evidenced by attributes such as low total cost of ownership, long-term reliability, diverse service options, and streamlined sales and delivery processes.

91. The 2024 10-K was signed, either directly or by proxy, by Defendants Nebreda, Pasha, Bulls, Mendoza, Humpton, Falck, Meier, Shelton, Smith, Fessenden, Arnold, Falu, and von Heynitz. The 2024 10-K was also accompanied by SOX Certifications made by Defendants Nebreda and Pashsa, wherein they attested to the accuracy of the 2024 10-K.

92. On January 25, 2025, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2024 Proxy"). The 2024 Proxy again assured investors that the Company had sufficient risk oversight mechanisms in place, stating:

> ***Risk assessment and oversight are an integral part of our governance and management processes. Our Board is responsible for overseeing our risk management process, while management is responsible for addressing the day-to-day risks facing the Company. Our Board focuses on our general risk management policies and strategy and the most significant risks facing the Company, and oversees the implementation of risk mitigation strategies by management***. Management apprises our Board of risk management matters when they arise in connection with other topics within the Board's oversight. A fundamental part of risk oversight is not only understanding the material risks a company faces and the steps management is taking to manage those risks, but also understanding what level of risk is appropriate for the Company. While the full Board has overall responsibility for risk oversight, it is supported in this function by its Audit Committee, Compensation and Human Resources Committee, Nominating and Corporate Governance Committee, and Finance and Investment Committee.
>
> Our Compensation and Human Resources Committee is responsible for overseeing the management of risks relating to the Company's compensation plans and arrangements, leadership succession planning, and the attraction and retention of key talent. See "*Compensation Discussion and Analysis - Determination of Executive Compensation - Compensation Risk Assessment.*" Our Nominating and Corporate Governance Committee manages risks associated with the independence of the Board and potential conflicts of interest, as well as having primary oversight of ESG matters and related risks. Our Finance and Investment Committee assists the Board to manage risks associated with our credit, liquidity, and financing activities and plans as well as tax strategies and potential strategic transactions and opportunities. ***The Audit Committee is specifically tasked with overseeing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which our exposure to risk is handled. The Company's Internal Audit team assists management in identifying, evaluating and implementing risk management controls and***

*methodologies to address identified risks. At each of its quarterly meetings, the Audit Committee meets privately with representatives from the Company's independent registered public accounting firm and the head of Internal Audit. In addition to the above, our Audit Committee directly oversees the management of financial risks* and cybersecurity risks and management's implementation of our cybersecurity risk management program. The Company's Chief Legal and Compliance Officer and members of his team also regularly update the Audit Committee privately on the Company's compliance and ethics programs and other compliance matters or concerns.

*The full Board is regularly informed through committee reports about such risks, as appropriate*. In addition, our Board receives periodic detailed operating performance reviews from management, who discuss the risks and exposures involved in their respective areas of responsibility as well as any developments that could impact our risk profile or other aspects of our business. These reports from management are designed to provide timely visibility to the Board and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

(Emphasis added).

93.     The 2024 Proxy also assured investors that the Individual Defendants were subject to its Code of Conduct, stating:

We have adopted a Code of Conduct and Ethics (the "Code of Conduct") that applies to all of our directors, officers, and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. Our Code of Conduct is available under the Governance section of the Investor Relations page of our website located at *www.ir.fluenceenergy.com*.

94.     The statements contained in ¶¶ 80-93 were materially false and misleading because Fluence failed to disclose, *inter alia*, that: (i) Fluence's relationship with Siemens and AES was likely to decline; (ii) Siemens Energy accused Fluence of engineering failures and fraud; (iii) Fluence's margins and revenue growths were artificially inflated due to Siemens' and AES' moves to divest; (iv) the Company failed to maintain adequate internal controls and risk oversight; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all

35

relevant times.

### The Truth is Revealed

95. The truth began to emerge on February 22, 2024, when Blue Orca Capital issued its report. *See supra* ¶¶ 74-77.

96. On news of the report, Fluence's stock price fell $2.28 per share, or approximately 13%, from a closing price of $17.01 per share on February 21, 2024, to a closing price of $14.73 per share on February 22, 2024.

97. Then, the truth fully emerged on February 10, 2025, when Fluence issued the 1Q25 Earnings Release. In the 1Q25 Earnings Release, the Company reported a net loss of $57 million, or $0.32 per share, for the first quarter, compared to a loss of $25.6 million, or $0.14 per share, for the same quarter of 2024. Fluence also reported that revenue of $186.8 million for the quarter, a decrease of 49% from the same quarter in 2024. The Company revealed that it was lowering its total revenue guidance for 2025 to $3.1 billion to $3.7 billion, a decrease from the prior guidance of $3.6 billion to $4.4 billion. In explaining the decrease, Defendant Nebreda stated that "[w]e have experienced customer-driven delays in signing certain contracts that, coupled with competitive pressures, result in the need to lower our fiscal year 2025 outlook."

98. On this news, Fluence's stock price fell $6.07 per share, or approximately 46%, from a closing price of $13.07 per share on February 10, 2025, to a closing price of $7.00 per share on February 11, 2025.

### Harm to the Company

99. As a direct and proximate result of the Individual Defendants' misconduct, Fluence has lost and expended, and will lose and expend, millions of dollars.

36

100.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Nebreda and Pasha, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

101.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

102.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

104.    Plaintiff will adequately and fairly represent the interests of Fluence and its shareholders in enforcing and prosecuting its rights.

105.    Fluence is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

106.    Plaintiff is a current shareholder of Fluence and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

107.    A pre-suit demand on the Board of Fluence is futile and, therefore, excused.  At the time this action was commenced, the twelve-person Board consisted of Individual Defendants Nebreda, Bulls, Arnold, Fessenden, von Heynitz, Humpton, Mendoza, Meier, Shelton, Smith, and Falú (the "Director Defendants") and non-party Peter Chi-Shun Luk ("Luk," and together with the

37

Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that six Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

108.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

109.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

110.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

111.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Fluence, the Director Defendants knew, or should

have known, the material facts surrounding Fluence's financial condition and internal control mechanisms.

112.    Defendant Nebreda is not disinterested or independent. In addition to being a director, Defendant Nebreda serves as President and CEO of the Company. Thus, as stated in the 2024 Proxy, the Company admits that Defendant Nebreda is a non-independent director. Furthermore, Defendant Nebreda is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

113.    Moreover, the Company conceded in the 2024 Proxy that Defendants Humpton, Meier, and Mendoza do not qualify as "independent directors" under the Nasdaq rules.

114.    Director Defendants Nebreda, Bulls, Mendoza, Humpton, Falck, Meier, Shelton, Smith, Fessenden, Arnold, Falú, and von Heynitz signed the 2023 10-K and 2024 10-K, Additionally, Director Defendants Nebreda, Bulls, Mendoza, Humpton, Falck, Meier, Shelton, Smith, Fessenden, Arnold, Falú, and von Heynitz solicited the 2023 Proxy and 2024 Proxy. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

115.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

116.    Furthermore, the Directors are not independent or disinterested in light of their longstanding business and personal relationships with each other and/or with entities affiliated with Fluence. For instance, Nebreda, Mendoza, Falú, and Shelton each currently hold, or

previously held, positions at AES. Defendant Nebreda served as Executive Vice President and President of US & Global Business Lines for AES from January 2022 through August 2022 and served in various other senior positions at AES and its subsidiaries from 2005 until 2022. Defendant Falú has served as Executive Vice President, Chief Operating Officer and President, New Energy Technologies SBU at AES since February 2024, and served in numerous roles at AES and its subsidiaries from 2003 until 2024. Defendant Mendoza has served as Executive Vice President and Chief Human Resources Officer at AES since February 2021, and served in various other roles at AES from 2006 until 2021. Defendant Shelton currently serves as Senior Vice President and Chief Product Officer of AES and President of AES Next, the strategic venture arm of AES, and served in various other roles at AES and its subsidiaries since 1994. Additionally, Directors Humpton and Luk hold positions at Siemens. Defendant Humpton has served as President and CEO of Siemens since June 2018. Luk has served as Senior Vice President, Corporate M&A at Siemens since December 2020. Moreover, Defendants Shelton, Smith, and Meier each serve on the board of directors of Fluence Energy, LLC. Furthermore, Defendant Smith has worked at QIA since 2012.

117.    All of the Board's current members derive substantial revenue from the Company, control the Company, and, as detailed above, are indebted to each other and the Company. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

118.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties,

face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

119.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

120.    Defendants Arnold, Bulls, Fessenden, and von Heynitz (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

121.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

122.    Accordingly, a pre-suit demand on the Board is futile and excused.

**COUNT I**
**Against the Individual Defendants for Violations of Section 14(a)**
**of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

125.    Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

126.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

127.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy and 2024 Proxy, which were filed with the SEC. As alleged above, the 2023 Proxy and 2024 Proxy were materially false and misleading because they failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to the Company's financial reporting, and that the Board and management were not complying with the

42

Code of Conduct.

128. The misrepresentations and omissions in the 2023 Proxy and 2024 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2023 Proxy and 2024 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board.

129. The materially false and misleading statements contained in the 2023 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Arnold, Bulls, Falck, Falú, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company

130. The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Arnold, Bulls, Falú, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

131. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2023 Proxy and 2024 Proxy.

132. As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

133. Plaintiff, on behalf of Fluence, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants
### For Breach of Fiduciary Duty

134. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

136.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

137.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

138.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) Fluence's relationship with Siemens and AES was likely to decline; (ii) Siemens Energy accused Fluence of engineering failures and fraud; (iii) Fluence's margins and revenue growths were artificially inflated due to Siemens' and AES' moves to divest; (iv) the Company failed to maintain adequate internal controls and risk oversight; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

139.    The Individual Defendants had actual knowledge that the Company was engaging

44

in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

140.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

141.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

142.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

143.    Plaintiff, on behalf of Fluence, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    By encouraging and accomplishing the illegal and improper transactions alleged

herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

146.    Plaintiff on behalf of Fluence has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Unjust Enrichment**

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fluence.

149.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Fluence that was tied to the performance or artificially inflated valuation of Fluence, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

150.    Plaintiff, as a shareholder and a representative of Fluence, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

151.    Plaintiff on behalf of Fluence has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Waste of Corporate Assets**

152.    Plaintiff incorporates by reference and realleges each and every allegation

46

contained above, as though fully set forth herein.

153.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

154.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

155.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf Fluence, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

    E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: March 25, 2025            **SPIRO & BROWNE, PLC**

          By:  */s/ David G. Browne*

             David G. Browne  (VSB No. 65306)
             2400 Old Brick Road
             Glen Allen, VA 23060
             Telephone: (804) 573-9220
             Email: (804) 573-9220

             *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
      vl@rl-legal.com
      lw@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com